# WHEELING.

## STATE OF WEST VIRGINIA v. HEATON.

Submitted September 19, 1883—Decided December 1, 1883.

1. When a bill of indictment is found by the grand jury and endorsed "a true bill," and this endorsement is signed by the foreman of the grand jury, it should be brought into court, presented by the grand jury, and their finding should be recorded. (p. 778.)

2. An omission to record the finding cannot be supplied by a paper purporting to be an indictment with an endorsement on it "a true bill," signed by the person who was the foreman of the grand jury at that time. (p. 779.)

3. *Quære:* Is it absolutely essential that the indictment should be endorsed "a true bill;" or if it be endorsed, that such endorsement should be signed by the foreman of the grand jury, in order that the accused may be tried on such indictment? (p. 779.)

4. The recording of the finding of the grand jury on the record-book need only describe the offence with which the accused is charged, as a felony or a misdemeanor, as the case may be, and need not more particularly describe the offence. (p 780.)

5. If the recording of this finding on the record-book does, however, describe the offence more particularly, and the offence so described is not an accurate description of the offence named in the indictment found by the grand jury, it will not vitiate the indictment, unless the offence, as it is recorded, is in irreconcilable conflict with the offence named in the indictment found by the grand jury. (p. 780.)

6. Nothing need be added to the endorsement of "a true bill" on the indictment, which is signed by the foreman of the grand jury; and if anything else is added by way of a description of the offence, it is not to be regarded as a part of the finding of the grand jury, but must be regarded as surplusage, and though ever so so false it would not vitiate the indictment. (p. 780.)

7. If a horse is owned by one who dies intestate leaving a widow and infant children, and no administrator has qualified on the estate of the decedent, and the horse remains on the farm of the decedent, and there has been no sale or distribution of the decedent's estate, but the horse as well as the children remains on the farm under the control of the widow, and while so under her control the horse is stolen, it may properly be described in an indictment for such stealing as the property of the widow. (p. 781.)

8. If in an indictment for larceny the court at the instance of the State gives the following instruction to the jury : "The jury is instructed that if property be stolen and recently thereafter be found in the exclusive possession of the prisoner, then such possession of itself affords sufficient grounds for a presumption of fact, that he was the thief, and in order to repel the presumption makes it incumbent on him on being called on for the purpose to account for such possession consistently with his innocence. If he gives a reasonable account of it, then it devolves upon the State to prove that such account is untrue. If he gives an unreasonable account of it, then it devolves upon the pris-

oner to sustain his statement by other evidence," the prisoner
files a bill of exception to the giving of such instruction, the
Appellate Court will reverse the judgment against the prisoner
and award a new trial because of the giving of such instruction,
it being an unwarrantable interference by the court with the
province of the jury.  (p. 782.)

9. *Price's Case*, 21 Gratt. 847, disapproved so far as it approved of
giving to the jury the instruction set out in the seventh point of
the syllabus of that case.  (p. 793.)

GREEN, JUDGE, furnishes the following statement of the
case:

On October 6, 1882, the grand jury found the following
indictment against William G. Heaton:

"WEST VIRGINIA, GILMER COUNTY, TO-WIT:

"*In the Circuit Court of said County, October term,* 1882.

"The jurors of the State of West Virginia in and for the
body of the county of Gilmer, and now attending the said
court, upon their oaths present that William G. Heaton, on
the — day of July, 1882, in the said county, one sorrel horse
of the value of one hundred dollars, of the goods, chattels
and horse of Amanda Miller, then and there being found,
feloniously did steal, take and carry away against the peace
and dignity of the State.  Found upon the evidence of H.
Gainer, T. C. Harris, A. Bright, Frank Waggoner and
Philip Brooks, witnesses sworn in open court and sent to the
grand jury to give evidence at the instance of the prosecuting
attorney."

On this indictment was this indorsement:  "State of West
Virginia *v.* William G. Heaton—indictment for grand lar-
ceny.  A true bill.  A. Burk, Foreman."  The entry on the
record was:  "The grand jury on their oaths presented an
indictment against William G. Heaton for felony a true bill."
The prisoner being arraigned at once pleaded "not guilty."
On June 6, 1883, the prisoner moved the court to quash the
indictment against him, which motion the court at once over-
ruled; and the prisoner again pleaded "not guilty," and the
State joined issue on that plea.  A jury was selected accord-
ing to law and sworn to try this issue.  On June 11, 1883,
they found the prisoner guilty in manner and form as charged

in said indictment; and two days thereafter the prisoner withdrew his plea of not guilty; and the court entered of record that no other indictment was found against the prisoner at the term of the court when this indictment was found. And thereupon the prisoner moved the court to quash this indictment because there was no sufficient record of the finding thereof, because the endorsement thereon is not sufficient to identify this indictment with the finding of the grand jury, and because of errors on the face of the indictment, which motion the court overruled at once. And thereupon the prisoner moved the court to arrest the judgment on this verdict, on the ground that the record did not show a sufficient finding of the indictment against him; and the court at once overruled the same. Thereupon the court ascertained the term of his imprisonment in the penitentiary of this State at three years and rendered a proper judgment accordingly.

During the progress of the trial three bills of exceptions were taken by the prisoner, two of them to instructions granted by the court at the instance of the State, and one of them to the refusal of the court to grant an instruction asked by the prisoner. These instructions granted at the instance of the State were as follows:

"1st. The jury is instructed that the ownership or right of property in the horse in the indictment named, is sufficiently laid in Amanda Miller, provided the jury believe beyond a reasonable doubt from the evidence that Amanda Miller, at the time of the commission of the alleged offense, had the actual or constructive poesession or general or special property in the whole or any part of the horse, and that said Amanda Miller was a person competent by law to hold the property in her own name.

"2d. The jury is instructed that if property be stolen and recently thereafter be found in the exclusion possession of the prisoner, then such possession of itself affords sufficient grounds for a presumption of fact that he was the thief, and in order to repel the presumption makes it incumbent on him on being called on for the purpose to account for such possession *consistently* with his innocence: If he gives a reasonable account of it, then it devolves upon the State to prove that such account is untrue. If he gives an unreasonable

account of it, then it devolves upon the prisoner to sustain such account by evidence."

The instruction asked by the prisoner and refused by the court was as follows:

"If the jury believe from the evidence that the sorrel horse named in the indictment was the property of George W. Miller, that said George W. Miller died intestate about the 9th day of May, 1882, leaving surviving him Amanda Miller, his widow, and eight infant children and heirs-at-law, that at the time of the taking of the said horse on the farm whereon the said George W. Miller resided at the time of his death, and where said widow and children continued to reside, and that said horse was then used by the widow and children of the said George W. Miller in common, and that no administrator had been appointed for the said estate, and that no sale or distribution had been made of the property of the said decedent, then, although at the time of the taking of the said horse the said Amanda Miller may have had the control of the said horse as she had the control of her children—the jury must find the defendant not guilty."

The prisoner obtained a writ of error to the final judgment of the court, assigning as errors:

1st. Because the court erred in overruling the motion to quash the indictment, on the ground that the record of the finding thereof was insufficient, the record showing the finding of an indictment for felony, and the endorsement on the indictment, by which the indictment was to be identified, being for grand larceny.

2d. The court erred in refusing to give to the jury the instruction asked for by the prisoner.

3d and 4th. The court erred in giving the instructions asked for by the State.

5th. The court erred in refusing to arrest the judgment first, because the verdict was insufficient to show that the prisoner was found guilty of grand larceny; and, secondly, because the record of the finding of the indictment and the endorsement on the indictment are not sufficient to identify the indictment on which the prisoner was tried with the indictment found against him by the grand jury, the endorse-

ment being material for the purpose of establishing identity although not a part of the record.

*R. G. Linn and George Baylor* for plaintiff in error.

*Attorney-General Watts* for the State.

GREEN, JUDGE:

The solemnity required by law in making a criminal accusation is thus stated by the court in *The Commonwealth* v. *Cawood*, 2 Va. Cas. 541: "The bill of indictment is sent or delivered to the grand jury, who after hearing all the evidence adduced by the commonwealth decide whether it be a true bill or not. If they find it so, the foreman of the grand jury endorses on it 'a true bill' and signs his name as foreman; and then the bill is brought into court by the whole grand jury, and in open court it is publicly delivered to the clerk, who records the fact. It is necessary that it should be presented publicly by the grand jury; that is the evidence required by law to prove that it is sanctioned by the accusing body, and until it is so presented by the grand jury with the endorsement aforesaid, the party charged by it is not indicted, nor is he required or bound to answer to any charge against him, which is not so presented." There is no question but that this correctly describes the regular and proper mode of proceeding in the institution and presentation of criminal charges both in England and in this State. It is true that in a case in Virginia decided in 1872 and therefore not binding as authority upon us it was held, that while this was the regular and proper mode of proceeding, yet it was not absolutely necessary that the indictment should be endorsed by the grand jury "a true bill," or that this endorsement, if made, should be signed by the foreman of the grand jury. And in *Burgess* v. *The Commonwealth*, Va. Cas., Dade J., who delivered the opinion, expressed views which countenance this decision rendered in 1872 in *Price's Case*, 21 Gratt. 858.

This case proceeds on the idea that the principal use of requiring the grand jury to endorse on the indictment "a true bill" and the foreman of the grand jury to sign this

endorsement is to identify perfectly the indictment, which the record-book shows was found by the grand jury against the accused; and while this is the appropriate and perfect mode of identifying it, yet it ought not to be held as absolutely necessary as the accused would be sufficiently protected by the fact that the grand jury had appeared in open court and there openly presented the particular charge as a true bill, and a record of this fact was at once made on the record-book, and though this record described the indictment very generally simply as an indictment for a felony or an indictment for a misdemeanor against the prisoner, yet another indictment could not be substituted for it except upon the extreme hypothesis that the officers of the court in the face of the court and of the public were guilty of a fraud, which must inevitably be detected.

I am not now prepared to say, that in this State the endorsing on an indictment the words "a true bill," and the signing of such endorsement by the foreman of the grand jury, would under any circumstances be dispensed with. There is no decision binding on us, in which it has been so held. And certainly this long established and useful practice ought to be followed as the recognized and proper mode of avoiding difficulties, even if it were held not to be absolutely necessary. As I understand the decisions, if to this endorsement on the indictment of the words "a true bill" there is added, as is frequently done, a brief description of the contents of the indictment, such addition to these words "a true bill" though signed by the foreman of the grand jury would constitute no part of their charge or action but would be considered as mere surplusage; and as such additions to these words "a true bill" can serve no useful purpose, they ought not to be made. If however such additions are made they will be regarded as surplusage; and if, therefore, they are incorrect or even inconsistent with the indictment, they will not vitiate it, as they will be regarded as no part of the finding of the grand jury. See *Thompson's Case*, 20 Gratt. 729, 730.

While it is absolutely necessary that an entry should be made on the record-book of the finding by a grand jury of an indictment, it being held to be just as essential as the

entry on the record-book of the verdict or finding of a petty jury, still such entry need not describe the offence, for which the accused-has been indicted, in any but the most general manner as "a felony" or "a misdemeanor." If however there is added to this general description of the offence, as is generally done if the offence is a common law offence, but which ought not to be done, if it is a statutory offence, a description of the character of the offence, and this description of the character of the offence should not be accurate, it would not be a fatal error, unless the description was *irreconcilably* in conflict with that contained in the indictment, the office of this entry on the record-book not being to identify the exact crime, with which the accused stands charged, but merely to show that he has been openly and publicly indicted in open court by the grand jury. But if the entry should be irreconcilably in conflict with the indictment, on which the accused is to be tried, and the variance be called to the attention of the court, the prisoner could not be properly tried on such indictment, for the record would show, that no such indictment had ever been found by a grand jury. These are, as I understand the law, the principles which should govern in such cases, as they may be deduced from the decisions in Virginia and West Virginia. See *Burgess* v. *The Commonwealth*, 2 Va. Cases 483; *Commonwealth* v. *Cawood*, 2 Va. Cases 541; *Drake & Cochren's Case*, 6 Gratt. 665; *Crookham* v. *The State*, 5 W. Va. 510; *State* v. *Fitzpatrick*, 8 W. Va. 707; *State* v. *Gilmore*, 9 W. Va. 641.

Applying this law to this case there is obviously nothing in the first or fifth assignments of error made by the plaintiff in error in his petition. The indictment had entered upon it "a true bill" with the signature of the foreman of the grand jury. It is true, there were added to this endorsement the words "indictment for grand larceny." This addition was unnecessary but certainly was not objectionable, as it was a correct description of the offence. But even had there been instead of this correct description an incorrect description of the offence, it would have been a matter of no importance, as this description of the offence is not part of the finding or action of the grand jury but must be regarded as mere surplusage. The entry on the record-

book was: "The grand jury returned into court and upon their oaths presented an indictment against William G. Heaton for felony, a true bill." This entry was in all respects correct. It was unnecessary to describe the character of the felony in this entry. It is true, that, as it was a common-law offence and could have been accurately described very briefly by adding the words "grand larceny," it would have been well enough to do so; but in this case it would have been of no use to do so, as the entry on the record showed, that the indictment was endorsed by the grand jury "a true bill" and this identified the indictment far more accurately than it could have been identified by calling it "grand larceny" in the record-entry. The first and fifth assignments of error are idle.

The third assignment is equally without foundation. The instruction complained of lays down the law almost in the words of chapter 158 § 7 of our Code (see Code p. 714), and this provision of our statute-law is in the following words: "In a prosecution for stealing it shall be sufficient to prove that when the offence was committed the actual or constructive possession, or a general or special property, in the whole or any part of the personal estate stolen was in the person alleged in the indictment to be the owner thereof." Russell in his work on Crimes, volume 2 page 288, thus lays down the common-law: "There is no doubt that there may be a sufficient ownership of the goods stolen in a person who has only a *special property* in them; and that they may be laid as the goods and chattels of such person in the indictment. A lessee for years, a bailee, a pawnee, a carrier and the like have such special property; and the indictment will be good, if it lay the property of the goods either in the real owners, or in the person having only such special property in them. See 2 East. P. C. ch. 16 § 90 p. 653." On this law it is obvious that the court did not err in refusing the instruction asked by the prisoner; and therefore there is nothing in the plaintiff's second assignment of error.

It only remains to enquire whether there is foundation for the fourth assignment of error, that is, whether the circuit court erred in the following instruction given at the instance of the State:

"The jury is instructed that if property be stolen and recently thereafter be found in the exclusive possession of the prisoner, then such possession of itself affords sufficient grounds for presumption of fact that he was the thief, and in order to repel the presumption makes it incumbent on him on being called on for the purpose to account for such possession consistently with his innocence. If he give a reasonable account of it, then it devolves upon the State to prove that such account is untrue. If he give an unreasonable account of it, then it devolves upon the prisoner to sustain such account by evidence."

Before determining whether this instruction should have been given it is important for us to have a clear conception of what is meant by a *presumption* and by different characters of *presumption* as recognized in our law. Starkie in his work on Evidence has stated this perhaps as distinctly, as it will be found anywhere else. In the tenth edition p. 742 a *presumption* is thus defined: "A *presumption* may be defined to be an inference as to the existence of one fact from the existence of some other fact, founded upon a previous experience of their connection. * * * * The inference may be *certain* or not certain but merely *probable* and therefore capable of being rebutted by proof to the contrary. Presumptions thus defined are either *legal* and *artificial* or *natural.* They are artificial or *presumptions of law* whenever they derive from the law any technical or artificial operation and effect beyond their mere natural tendency to produce belief, and operate uniformly without applying the process of reasoning on which they are founded to the circumstances of the particular case. They are on the other hand *natural* when they act merely by virtue of their own natural efficacy. For instance whenever a particular presumption arises from the lapse of a *defined* space of time it is always in its nature *artificial.* Thus at the expiration of twenty years, without payment of interest on a bond, or other acknowledgment of its existence satisfaction was to be presumed; but if a single day less than twenty years had elapsed the presumption of satisfaction from mere lapse of time did not arise. This is obviously an artificial and arbitrary distinction. No man's mind is so constituted that the mere lapse of the single day which completes

the twenty years would absolutely generate in it the conviction or belief that the debt had been satisfied. But again; satisfaction may be inferred from the lapse of a shorter period, if it be rendered probable by other circumstances; for instance from the lapse of nineteen years; here the lapse of time is to be taken into account by the jury in estimating the probability whether, under all the circumstances, the debt has not been satisfied. Here however the lapse of time possesses no *artificial* or arbitrary operation, but is left to its mere *natural* tendency to convince the mind of the jury that the debt has been satisfied."

These *artificial* presumptions here defined are generally spoken of in the law-books as *presumptions of law;* and on the other hand the *natural* presumptions here spoken of are usually spoken of in the law-books as presumptions of fact. Presumptions of law may be divided into two distinct classes. One is called by Starkie a presumption of *mere law*, and the other a mixed presumption, or a presumption of law and fact. The one is drawn by the court and the other by the jury under the instructions of the court. This second class are, however, no less *artificial* than *mere legal* presumptions. They differ from the *mere legal* presumption, as they must be made by a *jury* and not by the *court*. As an instance of such a mixed presumption or a presumption of law and fact, a grant of an incorporeal hereditament will be presumed after an adverse possession of twenty years. This is obviously a legal presumption, as it is obviously *artificial*, yet it is called a mixed presumption or a presumption of *law and fact*, merely because it is drawn by a jury under the instructions of the court. So an unqualified refusal to deliver up goods on demand made by the owner is presumed to be a conversion in an action of trover, and is called a mixed presumption of *law and fact*, because it is drawn by a jury under the instructions of the court. It is, however, obviously a *legal* presumption, because it is *artificial;* for it is obvious that we cannot *naturally* infer that a man has *converted* goods to his own use simply because he refuses to deliver them to the owner on his demand. But as this detention is just as mischievous as a conversion, the law presumes from it a conversion; and it is a presumption of law and fact merely because the jury

draws this legal presumption under the instructions of the court.

From these *legal* presumptions whether of law or of law and fact, presumptions of fact, or as they are sometimes called of mere fact, differ entirely, as Starkie says, page 751: "They depend upon their own natural force and efficiency in generating belief or conviction in the mind, as derived from those connections which are pointed out by experience; they are wholly independent of any *artificial* legal relations and connections, and differ from presumptions of law in this essential respect, that those depend upon, or rather are, a branch of the particular system of jurisprudence to which they belong; but a mere natural presumption (a presumption of fact) is derived wholly by means of the common experience of mankind, from the course of nature and the ordinary habits of society. Such presumptions are, therefore, wholly independent of the system of laws to be applied to the facts when established; they remain the same in their nature and operation whether the law of England or Code of Justician is to decide upon the legal effect and quality of facts when found."

Many of these *natural* presumptions or presumptions of *mere fact*, which most frequently arise, have been spoken of and recognized by courts and judges in their decisions of cases and by text-writers; and often they are thus recognized without anything being said as to whether these presumptions thus recognized were *legal* or *artificial* presumptions or presumptions of *fact*, or natural presumptions. But being thus recognized by law these *natural* presumptions may be termed in an improper sense *legal* presumptions; for if no technical force is given them they are, properly speaking, presumptions of *fact* and not presumptions of law. Thus from the improper use of the expression, presumption of law, there has been unfortunately much confusion introduced into the opinions of the courts in some cases and in text-writers. For, as we shall presently see, it is all-important that presumptions of *law* and presumptions *fact* should not be confounded. Upon this subject Starkie in his work on Evidence, pp. 751, 752, says:

"Many presumptions of *mere* fact are recognized by the law,

and therefore in one sense, may be termed legal presumptions, which still, unless some degree of technical force and weight be given them beyond their natural operation · are properly to be ranked as presumptions of mere fact. The recent possession of stolen goods, on a trial for larceny, is recognized by the law as affording a presumption of guilt; and therefore in one sense is a presumption of law but it is still in effect a mere natural presumption (a presumption of mere fact); for although the circumstances may weigh greatly with a jury, it is to operate solely by its natural force, for a jury is not to convict on this or any other charge, unless they be actually convinced in their consciences of the truth of the fact. Such a presumption is therefore essentially different from the presumption in *law* where a jury were to infer that a bond had or had not been satisfied as a few days or even hours more or less had elapsed."

And in some instances, where this presumption of fact or *natural* presumption is such as to make the inference drawn clear beyond all doubt, the courts have treated this presumption, as though it a were presumption of ·law. See *Rex* v. *Luffe*, 8 East 193. On this subject Starkie says, p. 752.

" Although it be the peculiar province of a jury to deal with natural presumptions or presumptions of fact, and to make such inferences as their experience warrants, yet in some instances, where peculiar facts are inseparably connected according to the usual course and order of nature, and the interposition of a jury would be nugatory, the courts themselves will draw the inference. Thus on a question of bastardy, where the child has been born a few weeks after the access of the husband, the bastardy of the child will be inferred without the aid of a jury. *Rex* v. *Luffe*, 8 East 193."

The instruction given by the circuit court in this case assumes that the presumption that one found in the possession of stolen goods recently after they are stolen is the thief is a presumption of *fact* and not of *law*. There can be in my judgment no question but that the circuit court was right in this. In the case of the *State* v. *Smith*, 2 Ired. L. 406, Gaston, says: "From necessity, the law must admit, in criminal as well as civil cases, presumptive evidence; but in criminal cases, it never allows to such evidence any *technical* or *arti*-

*ficial* operation, beyond its natural tendency, to produce belief under the circumstances of the case. Presumptions of this kind are derived altogether by means of experience from the course of nature and the habits of society, and when they are termed legal presumptions, it is because they have been so frequently drawn under the sanction of legal tribunals, that they may be viewed as authorized presumptions. Among these is that which was in the mind of his honor, the recent possession of stolen goods, in the case of larceny, raising the presumption of the actual taking by the possessor." These are obviously the same as those views which I have quoted from Starkie; and with them I concur.

As then the law attaches no *technical* or *artificial* operation beyond its *natural* tendency to produce the belief under all the circumstances of the case to the recent possession of stolen goods, it is obvious from the definitions, we have given above, that the presumption arising therefrom is nothing but a *mere presumption of fact* and it is a misuse of language to call it a *legal* presumption, a misuse of language, it is true, into which the courts and text-writers have frequently fallen for reasons assigned by Starkie and Judge Gaston. The North Carolina courts decided in 2 Ired. L. 406, that such presumption arises "only when the possession is of a kind which manifests that the stolen goods have come to the possessor by *his own act* or at all events with his *undoubted concurrence.*"

In the case of *State* v. *Hodge,* 50 N. H. 510, after a very thorough and exhaustive examination of the whole subject and of many authorities the court decided : "There is no *legal* presumption of guilt from the exclusive possession of property recently stolen." The judges in that case say that the first practical difficulty in the way of making it a presumption of law is the impossibility of inventing a rule, by which to determine, whether the possession *is* recent or not. And as showing this they refer to *Cockin's Case,* 2 Lew. C. C. 235 ; *Rex* v. *Partridge,* 7 C. & P. 551 ; *Rex* v. *Adams,* 3 C. & P. 600 ; *Reg.* v. *Hewlett,* 2 Russ. on Cr. 728, note v ; *Rex* v. *Dewhirst,* 2 Stark. Ev. 449, n. z.; *Rex* v. *Evans,* 2 Cox C. C. 270 ; *State* v. *Williams,* 9 Ired. L. R. 140, 143, 148 ; *State* v. *Shaw,* 4 Jones N. C. 440 ; *State* v. *Kinman,* 7 Rich. 497,

501, 503, 504; *Jones* v. *State*, 26 Miss. 247, 249, 250; *Warren* v. *State*, 1 Iowa 106-109; *State* v. *Bennett*, 3 Brev. 514.

Bailey, judge, in the New Hampshire case, 50 N. H. 510, says: "But even if the point were not settled by authority we should come by a simple process of reasoning to the conclusion that there can be no absolute rule for drawing from recent possession of stolen property, a presumption of guilt without reference to the nature of the property. The possession of a metalic or paper piece of money of the smallest denomination five days after it was stolen might have less weight as evidence, than the possession. of the library of Howard University, or of. Powers' Greek slave or an elephant five years after the larceny of such property. It would ordinarily be more probable that the possessor could prove (by other evidence than his own testimony) how he obtained possession in the latter case than in the former. It is equally clear from reason and authority, that the presumption from. recent possession of stolen property depends upon the nature of the property.    *    *    *    *    *    *    Is it the duty of the court or the duty of the jury to determine whether in view of the nature of the property the possession is recent enough to raise the presumption? The duty has frequently been performed by the court. Courts governed by precedent can easily find precedent enough to put that duty upon them. But whenever a judge in the discharge of that duty, undertakes to charge a jury, he practically demonstrates and virtually admits, that there is no rules of law on the subject. He does not say to the jury 'there is a general rule of law or a *legal* presumption applicable to all kinds of property,' he must say in substance 'there is a general rule of law which finds guilt from the recent possession of stolen property;' but whether the possession is recent or not depends upon the nature of the property. There is no rule of law which divides the infinite varieties of property into three hundred and sixty-five or any other number of kinds and requires you or me to draw the presumption of one kind one day after the theft, from the possession of another kind two days after, and so on to the end of the list; that allotment of time and variety is left to my judgment; and in my judgment the time and variety in these

cases are sufficient to raise the presumption; this presumption found by me is binding on you. It is useless to call such a presumption a presumption of law. Call it what we may it is a presumption of fact. 2 Stark. on Ev. 684; 3 Gr. Ev. §§ 698, 701; 1 Whart. Cr. L. § 727; 7 Monthly Law Mag. 56, 57; *Engleman* v. *State*, 2 Ind. 91, 97; *Hall* v. *State*, 8 Ind. 439, 442; *Graves* v. *State*, 12 Wis. 591, 593. It is a presumption established by no legal rule, ascertained by no legal test, defined by no legal terms, measured by no legal standard, bounded by no legal limits. It has none of the characteristics of law. Whether it be found by the judge or the jury, the judge and the jury must be equally unconscious of finding in it any semblance of a legal principle however good such may appear in the result arrived at. Being a presumption of fact, it should according to our practice be drawn by the jury and not by the court."

The judge then proceeds to refer to and review 2 Bush. Cr. Pr. § 702; *Reg.* v. *Crowhurst*, 1 C. & K. 370; *Rex* v. *Evans*, 2 Cox C. C. 270; S. C. 1 Ben. & H. L. 66, 363 (1st ed.); and on these cases remarks: "When courts thus undertake to decide what is a satisfactory explanation or a reasonable account of the defendant's possession, they manifestly express an opinion on the facts and the weight of the evidence and not on any question of law. When Barron A. Colman told the jury in *Rex* v. *Evans* that if the statement of the prisoner accounting for his possession of the beetle was false, he must be presumed to have stolen it, the presumption intended was one of fact and not of law. There are more instances and illustrations of the general practice of the judge giving to the jury his opinion on the facts; and this general practice is the chief origin of the supposed legal presumption drawn from the possession of stolen goods." When judges, following the common practice of giving the jury their opinion of the facts and the weight of evidence, had charged juries year after year, for a great length of time, that the possession of stolen property was presumptive evidence of guilt, this form of judicial instruction finally came to be considered as the law of the land. Whether it was a matter of fact or a matter of law was practically immaterial, the influence of the court upon the jury being then generally overwhelming in cases,

that touched no political prejudice or sympathy.  Being constantly repeated by the court, it naturally acquired the position and strength of an established dogma.  The uniform practice of the judge, giving the jury his opinions on any matter of fact on which he saw fit to aid them in that way was unquestioned.  *McLanahan* v. *U. I. Co.*, 1 Pet. 182; *Games* v. *Stiles*, 14 Pet. 322, 327; *Mitchell* v. *Harmony*, 13 How. 131, 142, 148; *State* v. *Bennett*, 3 Brev. 514; S. C. 2 Const. Rep. 692; *State* v. *Kinman*, 7 Rich. 497, 501, 503, 504; *Bell* v. *Reed*, 4 Binn. 136, 137; *Pierce* v. *State*, 13 N. H. 559; *King* v. *The Dean of St. Asoph*, 21 St. Tr. 900, 923; Cooley Const. Lim. 320; Sedgwick St. & Const. Law 615, and authorities cited in *State* v. *Pike*, 49 N. H. 417, 436."

The judge subsequently on page 520 adds:  "It was not the practice to inform the jury that they were bound by the opinion of the judge in matters of law but not in matters of fact.  The line between law and fact was not drawn as it is now being drawn in this State.  The attention of the bar, the court and jury was seldom called to the distinction."  On page 521 he quotes from Best on Presumption, section 37, this language:  "The resemblance between inconclusive presumptions of law and strong presumptions of fact cannot have escaped notice.  The effect of each being to assume something as true until rebutted and indorsed in the Roman law and other systems when the decision of both law and fact are entrusted to a single judge, the distinction between them becomes in practice almost imperceptible; but it must never be lost sight of in the common law, when the franchises of judge and jury should always be kept distinct.  Unfortunately the line of demarcation between the different species of presumption has not always been observed with the requisite precision.  We find the same presumption spoken of by judges sometimes as a presumption of law, sometimes as a presumption of fact, sometimes as a presumption juries should be advised to make, sometimes as one which it was obligatory on them to make."

As his conclusion from the exhaustive review he says, on page 522:  "The law is burdened and obscured by a great mass of common opinion, general understanding, practice, precedent, and authority (including the presumption from

the possession of stolen property) that has passed for law, but is in truth not law but fact, coming down to us largely by descent from the ancient customs of the judge giving the jury his opinion of the evidence. To clear the law of this encumbrance, revive elementary principles strictly legal in their nature, separate the province of the court from the province of the jury and maintain the latter in its entirety, is a duty put upon us by the Constitution as interpreted in *Pierce* v. *State*, 13 N. H. 536, 543, 551, 554."

I have quoted thus largely from this opinion because the views therein expressed, so far as I have quoted them, express the views which I entertain deduced from an examination of the various decisions on this question; and to express my views in clear and emphatic language, I will add to these views however some other reasons, which have led me to the same conclusions. The statement that this " is a presumption established by no legal rule, ascertained by no legal test, defined by no legal terms, measured by no legal standard, bounded by no legal limits," is shown and illustrated by the great variety of language in which it has been stated by different courts. Thus in *People* v. *Thrrell*, 1 Wheeler's Reports 34, it is thus stated: " Possession of stolen property is not sufficient proof to convict on a charge of larceny where the circumstances are doubtful and *good character is shown.*" In *People* v. *Preston*, 1 Wheeler's Reports p. 41, the rule is laid down: " On a trial for larceny, proof of the possession of the stolen goods is evidence of the larceny charged when *good character is not shown.*" In these cases the rule is laid down, that the possession of stolen goods is presumption, that the possessor is the *thief*, unless he proves his *good character*. So far as these cases state, the qualification of the rule is the proof of good character by the prisoner, and not either the possession being recently after the theft or being *exclusive*. In *State* v. *Smith*, 2 Ired. L. 402, the rule is thus laid down: " The presumption is, that he who is found in possession of the stolen goods recently after the theft was committed is himself the thief applies *only* when the possession is of a kind, which manifest that the stolen goods come to the possessor *by his own act* or at all events *with his unquestionable concurrence.*" The rule

as thus stated is qualified by the character of the possession and does not, as others have stated it, depend upon its application to the possession being *exclusive*. In *State* v. *Bennet*, 3 Brev. 514 the rule is laid down thus broadly: " The possession of stolen goods is a presumption of guilt." Here there is no qualification of any sort. In *Jones* v. *State of Mississippi* there is no qualification of the rule except that the theft must be recently before the goods are found in the possession of the prisoner. And the court undertook to say that four or five months after the theft of a saddle was not recently after the theft within the meaning of the rule. The rule as laid down in *State* v. *Wolff*, 15 Mo. 174, has no qualification, except that the possession must be recently after the property was stolen. The rule as laid down in *Price's Case*, 21 Gratt. 847, is: " If property be stolen and *recently* thereafter be found in the *exclusive* possession of the prisoner then such possession of itself affords sufficient ground for a presumption of fact that he was the thief; and in order to repel the presumption makes it incumbent on him, on being called for the purpose, to account for the possession consistently with his innocence. If he give a reasonable account of it, then it devolves on the commonwealth to prove that such account is untrue. If he gives an unreasonable account of it, then it devolves on the prisoner to sustain such account by other evidence. What is such a recent possession as raises a presumption against the prisoner, in the meaning of the rule, is a question for the jury and depends upon the nature of the property and other circumstances of the particular case."

Many other cases might be cited, where the rule has been differently laid down but these will suffice to show that in determining, whether any presumption of guilt arises in any given case from the recent possession of the stolen property, the following among innumerable other circumstances are to be considered: first, the nature of the property; secondly, in close connection therewith and dependent thereon the length of time since the property was stolen; thirdly, whether the possession of the property by the prisoner was exclusive; fourthly, whether his possession was of such a character that the inference could be drawn therefrom that he came into

the possession of it by his own act; fifthly, that his possession was such that at least the inference could be drawn that he must have come into the possession with his *undoubted* concurrence; sixthly, his character as proven by witnesses; seventhly, his conduct when arrested; eighthly, the account he gives at the time of his arrest of the way in which he came into the possession; and ninthly, many other circumstances referred to and relied on by judges in expressing their opinions too numerous and special to be noticed particularly. To all these circumstances, so far as the decisions show, no *artificial* weight is attached by the law; but they are one and all of them entitled to their *natural* weight nevertheless. How then without an utter disregard of the meaning of language can this be regarded as a rule of law or a presumption of law? Is it not most obviously nothing but a presumption of fact? Are not all these circumstances including the recent possession of the stolen property nothing but facts, from which a jury may or may not properly draw the inference that the prisoner stole the property? And why then should not the jury be left to draw this inference of fact uninterfered with by the court, just as it is left to draw other inferences of fact? What is the use of laying it down that the jury is the judge of the facts and the court of the law, if the province of the jury in determining whether a certain fact, the stealing of the property by the prisoner, existed, is to be controlled or influenced by instructions from the court, when the facts to be deduced depend upon the existence of innumerable other facts, and the inference to be drawn from these is nothing but the natural inference to be drawn from all facts uninfluenced by any rule of law?

In *Smith* v. *The State*, 58 Ind. 341, it is held: "The presumption arising from the possession of stolen goods is one wholly of fact and not of law." In this the court of appeals of Virginia concurs. (*Wash's Case*, 16 Gratt. 530; *Price* v. *Commonwealth*, 21 Gratt. 846.) If this were a presumption of law, of course it would be proper for the court to instruct the jury to draw the legal inference; for, if it were a presumption of law, the law would give to the possession of property stolen an *artificial* weight and would not leave it to have only its natural weight with the jury in determining

the guilt of the prisoner; and if this were so, of course the court ought to instruct the jury, that such legal presumption existed, that is, that they were not to give to this possession of the stolen goods by the prisoner its *natural* weight in determining the prisoner's guilt, but an *artificial* weight such as the rule of law required, as stated in this rule of presumption, when laid down correctly by the court. But it seems to me to be perfectly clear, that if no artificial weight is given by the law to the recent possession of stolen goods by the prisoner, but it is, as we have seen, one of the numerous facts to be considered by the jury in determining, whether the prisoner was or was not the thief, it is obviously improper for the court to pick out this fact of possession and undertake, as it would do in giving an instruction on the subject, to indicate how much weight should be attached to it by the jury. Yet this was done by the court of appeals of Virginia in *Price's Case*, 21 Gratt. 846. I regard it as one of the numerous cases where the court confounds presumptions of *fact* and presumptions of *law*. For while it properly concluded that this was a presumption of *fact* and not of *law*, it goes on and treats it, instructing the jury in reference to it, just as though it had been a presumption of law and not of *fact*. Of course as a general rule while a court would always instruct a jury with reference to presumptions of law, it will certainly ordinarily not instruct a jury with reference to presumptions of *fact*; for this would be obviously an encroachment on their province, they being the judges of fact; and in this State and in Virginia the courts have always been peculiarly cautious not to encroach on the province of juries by any intimation of opinion as to the weight of the evidence or any instruction, which would influence them in determining the weight they should attach to any evidence. (*State v. Hunt*, 11 W. Va. 75; *Ross v. Gill et ux.*, 1 Wash. 87; *McDowell's Ex'or v. Crawford*, 11 Gratt. 307; *State v. Betsall*, 11 W. Va. 703; *State v. Thompson*, 21 W. Va. 741, 742.) The spirit evinced by these and other cases seem to me obviously violated, when the court as in *Price's Case* undertook to approve of an instruction to a jury, which was designed to influence or instruct them how much weight they should give to the possession by the prisoner of stolen property recently

after it was stolen taken in connection with such possession being exclusive, and to tell them what sort of evidence should be given by the prisoner in order to outweigh this evidence of the commonwealth.

It is obvious, from what we have said, that this recent exclusive possession must depend upon surrounding circumstances for its quality and effect, as upon the nature of the goods, the character of the possession, even though it be exclusive, the character of the prisoner and his standing in the community, and a great variety of other circumstances; and therefore it would be clearly improper in such a case for a court to interfere with a jury by endeavoring to aid them in drawing a conclusion of fact from a great variety of facts and circumstances. In the case of *Washington* v. *B. & O. R. R. Co.* 17 W. Va. 215, in speaking of a matter somewhat resembling this, we said even in a civil case: "It is not proper for a court to separate a few facts from their connection with others, and make them the basis of an instruction of this character. Such a course would tend to mislead the jury. While the court has the power to set aside the verdict of a jury and grant a new trial in a proper case, still it is not proper for the court to derogate from the proper province of the jury, as it would do if it should separate a particular fact from its connection with others on which it is dependent for its quality, and instruct the jury that such fact constitutes negligence." Now it seems to me much more improper, that in a criminal prosecution, if the court separate the possession of stolen goods by the prisoner from its connection with the nature of the goods, and as connected then with the length of time since they were stolen, the good character of the prisoner, the character of the possession which might evince that the property might not have been taken by him, though it was in his possession and many other facts and circumstances, as for instance, his behavior when arrested, and then on this possession, though recent and exclusive, base an instruction that it gives rise to a presumption of guilt. And it seems to me that it does not make this any the less objectionable, that the court tells the jury, that this is a presumption of fact. Such an instruction derogates from the proper province of a jury and ought not to be given. I will not say

that there is no case in which a court might without derogating from its proper province, instruct the jury with reference to a presumption of *fact*; but such an instruction, especially in a criminal case, could very rarely be proper, though perhaps it might be, where the presumption arose from some prominent fact not depending upon surrounding circumstances for its quality, in regard to the effect and character of which no room is left for ordinary minds to differ. In such case if the court below had given an instruction with reference to presumption of *fact*, we would be reluctant to set aside the verdict because of such instruction, it being apparent that no injury could have resulted from its being given, especially if there were precedents for such instruction, and especially if on the authorities it was doubtful whether the presumption was one of law or fact.

But this is not a case of this character. The instruction in this case is taken from the one approved by the Virginia court of appeals in *Price's Case*, 21 Gratt. 846, though it is more objectionable than that instruction. But had it been in the words of the instruction in that case, we would equally have condemned it as in derogation of the province of the jury. The instruction in the case which is now under consideration we regard as much in derogation of the province of the jury as were a number of the instructions asked by the prisoner in the case of the *State* v. *Thompson*, 21 W. Va. 741, 742, syl. 3, which this Court declared ought not to be given. Of this character in that case were instructions No. 3 p. 744, No. 6 p. 744, No. 8 p. 745, No. 9 p. 745. One of these instructions thus rejected by this Court as improper to be given was in effect, that if the jury was satisfied that certain witnesses have each of them wilfully and knowingly sworn falsely as to any part or matter material to the issue involved in this case, the jury are to disregard each and every other material fact sworn to on this trial by such witness, except so far as they may be satisfied from the evidence, that the other material facts so sworn to by such witnesses has been corroborated by other credible evidence in the case. This amounted to an instruction that if the witness wilfully and knowingly swore falsely to any material fact, he was presumed to be unworthy of belief, and no part of his testimony should be

believed, unless it was corroborated. This presumption is not a presumption of law, but like the one referred to in the instruction in this case is a mere presumption of fact; and therefore this Court held it should have been left to the jury uninfluenced by any instruction from the court. Yet the court did not regard it as improper in lieu of such instructions for the court to instruct the jury, that they might disregard the whole of the testimony of such witness, or they might give such weight to the evidence of such witness on other points, as they might think it entitled to, and that the jury were the exclusive judges of the weight of the testimony. See instruction No. 3 p. 746, 21 W. Va. We say on p. 758: "The circuit court properly declined by this or any other instruction asked to interfere by the expression of any opinion or views on the weight of the evidence, or the manner in which it was to be weighed."

We are therefore of opinion that because of the error of the circuit court in giving at the instance of the State this instruction set out in the third bill of exceptions, the judgment of the circuit court rendered on June 13, 1883, so far as it ascertained the term of imprisonment of the said Wm. G. Heaton in the penitentiary of this State at three years, and so far as it adjudged that he be imprisoned in the penitentiary of this State for the term of three years, the period fixed by said court; and so far as it ordered that the sheriff of Gilmer county do, as soon as possible after the adjournment of said court, convey said Wm. G. Heaton from the jail of said county to said penitentiary of this State, there to be kept and imprisoned and treated in the manner directed by law, be and the same is hereby set aside, reversed and annulled, and that the residue of the said judgment of June 13, 1883, be affirmed. And this Court proceeding to render such judgment as the said circuit court ought to have rendered, doth set aside the verdict of the jury rendered in said cause, and doth award a new trial of the issue in said case. And this case is remanded to the circuit court of Gilmer county to be further proceeded with according to the principles laid down in this opinion, and further according to law.

REVERSED IN PART.     REMANDED.